**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| LOUIS P. URCINOLI, | : | **Hon. Garrett E. Brown, Jr.** |
| | : | |
| Petitioner, | : | Civil Action No. 05-4776 (GEB) |
| | : | |
| v. | : | **O P I N I O N** |
| | : | |
| RONALD H. CATHEL, et al., | : | |
| | : | |
| Respondents. | : | |
| | : | |

**APPEARANCES:**

> LOUIS P. URCINOLI, #00134995C
> New Jersey State Prison
> Trenton, New Jersey  08625-0861
> Petitioner Pro Se

> OCEAN COUNTY PROSECUTOR
> ROBERTA DiBIASE, ASSISTANT PROSECUTOR
> P.O. Box 2191
> Toms River, New Jersey  08754
> Attorneys for Respondents

**BROWN, Chief Judge**

Louis P. Urcinoli filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. §

2254(a) challenging a conviction in the Superior Court of New Jersey, Ocean County.  This

Court dismissed the Petition as untimely.  Petitioner appealed and the United States Court of

Appeals for the Third Circuit granted a certificate of appealability.  The Third Circuit reversed

and remanded for this Court to consider Petitioner's claims on the merits.  The parties filed

supplemental papers.  For the reasons expressed below, the Court will dismiss the Petition and

deny a certificate of appealability.

## I.  BACKGROUND

Petitioner challenges a judgment of conviction entered on December 13, 1996, in the Superior Court of New Jersey, Ocean County, after a jury found him guilty of the purposeful or knowing murder of Nicole Russo on March 12, 1995 ("Count One"); conspiracy to murder Bernard Mancuso, Petitioner's uncle and a potential witness in the murder prosecution ("Count Two"); and two counts of attempted murder of Mancuso and his wife ("Counts Three and Four"). The Law Division sentenced Petitioner to an aggregate term of life imprisonment plus 20 years, with a 40-year period  of parole ineligibility.  Petitioner appealed.  The Superior Court of New Jersey, Appellate Division, affirmed the conviction and sentence.  State v. Urcinoli, 321 N.J. Super. 519 (App. Div.), cert. denied, 162 N.J. 132 (1999) (table).  On September 28, 1999, the New Jersey Supreme Court denied Petitioner's petition for certification.  Id.

The Appellate Division described the facts as follows:

> In late February 1995, Nicole Russo began dating defendant, who became a nightly dinner guest at the Russo home . . . .  On March 11 defendant dropped off Nicole at the Russo house and left.  Half an hour later Brian Markowski, Nicole's old boyfriend, came by her house to see her . . . .  Later [that day, Nicole] told her mother that she had made a decision about whom she wanted to date and that she had told the defendant that she was going back to Brian . . .

> The following morning, March 12, 1995 . . . Nicole was out walking and holding hands with Brian when defendant drove up to them.  Defendant asked Brian to ride with him to discuss matters . . . .  Brian testified that defendant wanted him to "back off" from Nicole.  When Brian said that it was up to Nicole, defendant asked him if he wanted to fight.  After Brian declined, defendant drove back to rejoin Nicole.  Nicole took defendant aside to talk, and he then drove off.  She said to Brian that she had just told the defendant that she wanted to be with Brian and not with him.

2

About 1:00 p.m. Nicole, Brian and Frank Quigley were at Brian's grandmother's house to say goodbye to Brian before he went back to his home in Brooklyn.  Nicole and Quigley then went back to her home.  Defendant arrived dressed up at about 2:00 p.m. and reminded Nicole that she had promised to go with him to his mother's home in Hauppague, Long Island that day.  Quigley testified that Nicole was hesitant but finally agreed . . . .  She agreed to call and let her parents know if she would be staying overnight.  Nicole never called and was never seen or heard from again after she drove off with defendant in his maroon Subaru . . . .

[The next day, Nicole's father contacted defendant who] told him that he had driven Nicole to Brooklyn the night before.  He said he dropped her off at about 9:30 p.m. . . . because Nicole wanted to go to Brian's house to pick up a pager that belonged to her.  She was to page defendant when she wanted him to pick her up, but she never did . . . .  [D]efendant [told Nicole's father] that he and Nicole had had an argument and that she got out of the car with her radio and her clothes in her arms.  He said that he assumed she went to Brian's house just a few blocks away . . . .

At 6:00 p.m. on Monday, March 13, Mr. Russo called the Brick Township Police Department to report that his daughter [was] missing.  He spoke to Detective John Bender . . . .

After his conversation with Mr. Russo, Detective Bender paged defendant, who called him fifteen minutes later.  Bender told defendant he was looking for Nicole, and defendant told him the same story he had told Mr. Russo.  He also gave his New Jersey address . . . .  Later Bender called the Seaside Park police and learned that there was no such address . . . .

On Wednesday, March 15, Mr. Russo found out from one of Nicole's friends that defendant lived at a motel in Seaside Park . . . .  Mr. Russo called Bender the same day with defendant's real address at the Parkside Motel.  Bender called the owner, William Hansen, and told him that he was investigating a runaway who was the girlfriend of one of Hansen's tenants.  Bender asked to be let into defendant's room because it was believed that there was a "strong possibility that Nicole was in that room . . . ."

Detective Bender met Hansen and a maintenance worker, Kenneth Brower, at the motel.  After no one answered, Brower opened the

room with a passkey.  But Hansen and Brower immediately commented that the carpet and two sofa cushions were missing. Brower told Detective Bender he had been in the apartment the week before and that the carpet and cushions had been there.

A woman's blouse and pants were on the couch.  Men's clothes were hanging from a rack.  School books with Nicole's name on them were on a table.  When Bender went into the bathroom, he saw the Mickey Mouse backpack [belonging to Nicole] under the vanity.

Bender then called Mr. Russo from the apartment and told him that although his daughter was not there, her things were.  Bender was convinced that Nicole was staying in defendant's apartment.

At 8:00 that night, Bender went back to the Parkside Motel to see if Nicole had returned.  He met Robert Romaniello, who lived next door.  After being shown Nicole's picture, Romaniello identified Nicole's picture and said he first saw her on March 6 when she helped defendant move into his apartment.  He said that about 5:00 p.m. on Sunday, March 12, he saw defendant and Nicole drive up in a maroon Subaru and enter the apartment.  He described Nicole wearing clothes similar to those she wore when she left her home.

Romaniello said that after defendant and Nicole went inside the apartment, he sat outside on a bench directly underneath defendant's window to wait for friends to arrive for a planned barbecue.  As Romaniello sat with the back of his head up against the wall, he heard muffled voices.  A couple of minutes later defendant walked outside and asked Romaniello how he was doing.  Defendant went back into his apartment and immediately emerged, closing the door behind him, and walked around the corner toward the 7-Eleven store . . . .  About five minutes later, defendant returned to his apartment with a bag in his hand and closed the door . . . .  Romaniello returned to his apartment and watched a movie.  He fell asleep and was awakened at about 8:30 p.m. by a vehicle with a loud muffler.  Thinking that it may have been his friends, Romaniello looked outside and saw a white van parked behind his car.  He no longer saw defendant's Subaru.

At about 9:00 p.m., Romaniello heard a loud thud on the adjoining wall to defendant's apartment, which he described as someone or something being slammed against the wall.  At about 10:30 or

4

11:00 p.m., Romaniello saw defendant leave his apartment, open the van's side door, re-enter his apartment and return with a roll of carpet over his shoulder.  Defendant turned the carpet around, placed it in the back of the van, closed the van door and drove off.

Recalling the missing carpet along with defendant's odd behavior as described by Romaniello, and the inconsistency of defendant's story that he had dropped off Nicole in Brooklyn at 9:30 p.m. when Romaniello saw him in Seaside Park at that time, Detective Bender began to realize that the case involved more than a runaway girl . . . .  After paging defendant again with no response, he called the Major Crimes unit of the Ocean County Prosecutor's Office.

Search warrants were signed the following day based on Bender's affidavit for both defendant's apartment and the Ford van, which was located in Hauppague . . . .  At defendant's apartment investigators recovered a pair of size six red jeans, a black shirt and a green jacket found on a bloodstained couch.  The Mickey Mouse backpack was under the bathroom sink.  Bloodstains were located on the bed frame, a chair, the bureau and door frame.  A presumptive test for blood was performed which revealed blood in the bathroom and in the kitchen drains.  On the bed were a pink and a white shirt, which also appeared positive for blood . . . . [T]he Luminol showed a circular wiping motion, causing [the tester] to conclude that a great deal of blood had been cleaned up . . . .

On the afternoon of March 17 . . . , Detective Bender received a message from headquarters that an arrest warrant had been issued for defendant and that defendant had contacted his uncle in Connecticut.  The following day Bender . . . traveled to Wilton, Connecticut to interview Bernard Mancuso and his wife, Nancy . . . .

[O]n Friday, March 17, at about 1:30 p.m. defendant called.  Nancy answered.  [Nancy picked defendant up at the train station and he said the police were looking for him.]  Alone in the living room with Bernard, defendant told him that he had had a fight with his girlfriend and hit her in the head six or seven times with a crowbar.  When Bernard asked if she was dead, defendant told him that he was sure that she was because he "went back and slit her throat." Defendant told him that it had happened in his apartment in New Jersey and that he cleaned up well but "messed up" by leaving his

5

blood-stained shirt at the apartment . . . .  Bernard told him that
fingerprints would convict him but defendant said he has wrapped
Nicole's body in six or seven garbage bags, put her in a van, drove
her to Long Island and put her in a dumpster.  He refused to tell
Bernard the location of the dumpster where he put the body.

Bernard was mortified and afraid for himself, his wife and his
daughter.  When defendant asked him for money, he gave him the
$200 he had in his wallet to get him out of the house.  He then
drove defendant back to the train station . . . .

On March 27, 1995, defendant called the Mancuso home.
[Defendant told Bernard] he was in Los Angeles and asked him for
money so that he could come home and straighten things out.
Bernard refused to transfer money but said he would arrange for a
plane ticket waiting for him at the Los Angeles airport . . . .
Defendant was arrested at the Los Angeles airport when he
attempted to pick up his ticket . . . .

When he was returned to New Jersey, defendant was housed in the
Ocean County Jail to await trial, and he became acquainted with
Thomas MacPhee.  MacPhee testified that defendant asked him if
he knew anyone in the streets to kill his uncle for him because he
felt that if the uncle testified against him, he would get thirty years
in jail.  MacPhee questioned why defendant would kill his uncle if
he was innocent of killing Nicole.  Defendant then admitted to
MacPhee that he had killed her and that he was mad at her because
she made him kill her . . . .  According to MacPhee defendant said
he wanted his uncle tortured.  When MacPhee said cutting him up
could be messy, defendant said it would not be a mess as he had
cut up Nicole and put her in trash bags and buried her so that the
body could never be found.

When MacPhee told defendant that he did not know anyone who
would do the job, defendant asked MacPhee to do it when he got
out of jail and promised him $5,000.  Defendant showed MacPhee
his bank statement which had about a $25,000 balance.  MacPhee
pretended to go along with the plan.  He said defendant gave him
detailed descriptions of Bernard and Nancy Mancuso, directions
to their home, descriptions of their cars and license plate numbers, as
well as an explanation of Bernard's daily routine at the train station
and the address and directions to their summer home . . .

6

Urcinoli, 321 N.J. Super. at 523-533.

On October 22, 1999, Urcinoli filed a pro se notice of motion to file a petition for post conviction relief in the Law Division.  In his attached certification, Urcinoli averred that, when he returned to his apartment on March 12, 1995, from the Seven-Eleven convenience store, he found Nicole Russo dead, with a knife sticking out of her neck and her left wrist cut.  Urcinoli states that he disposed of the body because he was afraid he would be charged with murder.  He avers that, although he told his attorney that he wanted to testify, his attorney advised him that he would be a terrible witness and refused to permit him to testify.  Urcinoli contended in his motion for post-conviction relief that he did not receive a fair trial because he was not given the opportunity to testify.  He further argued that trial counsel was ineffective because he failed to request a jury charge on the lesser included offenses of murder.  In a pro se letter brief submitted to the trial court, Petitioner argued that trial counsel was ineffective for failing to object to testimony concerning luminol testing of his apartment for blood and failing to properly cross-examine witnesses for the State.  After hearing oral argument, the trial court denied the application on April 20, 2000.  Petitioner appealed.  In an opinion filed on December 10, 2001, the Appellate Division affirmed denial of the petition for post-conviction relief.  See State v. Urcinoli, Docket No. A-6329-99T4 slip op. (N.J. Super. Ct., App. Div., Dec. 10, 2001).  On May 22, 2002, the Supreme Court of New Jersey denied the petition for certification.  See State v. Urcinoli, 172 N.J. 359 (2002) (table).

On August 5, 2002, the Clerk of this Court accepted Urcinoli's first petition for writ of habeas corpus ("first petition") pursuant to 28 U.S.C. § 2254 for filing.  See Urcinoli v. Hendricks, Civil No. 02-3813 (GEB) (D.N.J. filed Aug. 5, 2002).  The petition raised eight

grounds.  In an Opinion and Order filed October 31, 2003, this Court dismissed the petition

without prejudice as a mixed petition, see 28 U.S.C. § 2254(b), (c), and declined to issue a

certificate of appealability.  Id.  Specifically, this Court determined that the petition was a mixed

petition because Petitioner had not presented five of his eight claims to the New Jersey courts as

federal claims.  See Baldwin v. Reese, 541 U.S. 27 (2004); Duncan v. Henry, 513 U.S. 364, 365-

66 (1995).

On December 13, 2003, Petitioner signed his second state petition for post conviction

relief.  On March 30, 2004, the Law Division denied relief.  Petitioner appealed, and in an

opinion filed March 1, 2005, the Superior Court of New Jersey, Appellate Division, affirmed the

order denying post conviction relief.  See State v. Urcinoli, Docket No. A-4432-03T1 slip op.

(App. Div. March 1, 2005).  The Appellate Division rejected Petitioner's claims as follows:

> While defendant's point headings in this brief are not illustrative of
> his arguments, his arguments are totally lacking in substance.  He
> claims, as he did in the first PCR petition, that trial counsel failed
> to properly investigate and prepare the case prior to trial, but does
> not articulate any specifics with respect to what could have or
> should have been investigated and presented, nor does he proffer
> any evidence that would change the outcome of the trial.  He
> claims that trial counsel was totally unprepared for trial and that
> counsel's cross-examination was "entirely unfocused and
> irrelevant."  Again, defendant fails to present specifics as to what
> counsel could have or should have done, or how it would have
> changed the outcome of the trial.  He argues that appellate counsel
> was also unprepared and inadequately represented him, again
> without providing specifics.

Id. at p. 7.

On September 12, 2005, the New Jersey Supreme Court denied Petitioner's petition for

certification.  See State v. Urcinoli, 185 N.J. 264 (2005) (table).

8

On September 29, 2005, Petitioner signed his second § 2254 Petition, which is now

before this Court on remand.  The Petition raises eight grounds:

> Ground One:  THE TRIAL COURT VIOLATED THE
> FOURTEENTH AMENDMENT AND ABUSED ITS
> DISCRETION BY DENYING DEFENDANT'S MOTION FOR A
> JUDGMENT OF ACQUITTAL ON COUNTS TWO, THREE,
> AND FOUR BECAUSE NO REASONABLE JURY COULD
> HAVE CONVICTED HIM OF ATTEMPTED MURDER AND
> CONSPIRACY TO COMMIT MURDER.
>
> Ground Two:  THE WARRANTLESS ENTRY BY POLICE
> INTO DEFENDANT'S APARTMENT VIOLATED THE
> FOURTH AMENDMENT AND ALL SUBSEQUENT POLICE
> SEARCHES WERE THE FRUIT OF THIS CONDUCT.
>
> Ground Three:  THE TRIAL COURT'S ADMISSION OF
> EVIDENCE THAT THE DEFENDANT STOLE A USED CAR
> WAS IRRELEVANT, UNDULY PREJUDICIAL AND
> VIOLATED THE FOURTEENTH AMENDMENT.
>
> Ground Four:  THE TRIAL COURT'S FAILURE TO SEVER
> COUNTS TWO, THREE, AND FOUR VIOLATED THE
> FOURTEENTH AMENDMENT BECAUSE PREJUDICE TO
> THE DEFENDANT OUTWEIGHED JUDICIAL ECONOMY.
>
> Ground Five:  THE TRIAL COURT'S ADMISSION OF EXPERT
> DNA TESTIMONY VIOLATED THE FOURTEENTH
> AMENDMENT BECAUSE THE REPORT WAS NOT
> PROVIDED TO DEFENSE COUNSEL UNTIL AFTER THE
> TRIAL BEGAN.
>
> Ground Six:  THE INSTRUCTIONS VIOLATED THE DUE
> PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT
> BECAUSE THE COURT FAILED TO INCORPORATE
> EVIDENTIARY FACTS INTO THE CHARGE AND FAILED TO
> CHARGE THE JURY ON THE LESSER INCLUDED
> OFFENSES OF AGGRAVATED AND RECKLESS
> MANSLAUGHTER AND PASSION-PROVOCATION
> MANSLAUGHTER, WHEN THE EVIDENCE REQUIRED
> SAME, THUS LIMITING THE JURY'S OPTIONS TO

CONVICTION OR ACQUITTAL FOR MURDER ON COUNT ONE.

Ground Seven:  TRIAL COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE FOR REFUSING TO PERMIT DEFENDANT TO TESTIFY, FOR FAILING TO REQUEST INSTRUCTIONS ON THE LESSER INCLUDED OFFENSES TO MURDER, AND FOR PURSUING AN ERRONEOUS DEFENSE THAT NICOLE RUSSO WAS NOT DEAD.

Ground Eight:  TRIAL COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE FOR FAILING TO PROPERLY CROSS-EXAMINE SEVERAL WITNESSES.

(Pet. ¶ 12, Rider C at Docket Entry #1.)

By Opinion and Order entered August 4, 2006, this Court dismissed the Petition as time barred and denied a certificate of appealability.  The Third Circuit granted Petitioner's request for a certificate of appealability.  By mandate filed on January 29, 2010, in this Court, the Third Circuit reversed and remanded for this Court to consider the exhausted claims Petitioner presented in his Petition.  The parties thereafter filed a supplemental Answer and Reply.[1]

## II.  STANDARD OF REVIEW

Section 2254(a) of Title 28 of the United States Code gives the court jurisdiction to entertain a habeas petition as follows:

---

[1] Respondents argue that certain claims are unexhausted, and that the Petition should be denied on the merits. To the extent that Petitioner's claims are unexhausted and/or procedurally defaulted, this Court will deny them on the merits pursuant to 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").  See Taylor v. Horn, 504 F. 3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of Taylor's claims on the merits, we need not address exhaustion"); Bronshtein v. Horn, 404 F. 3d 700, 728 (3d Cir. 2005) ("We would permit Bronshtein to attempt on remand to establish a reason to excuse his procedural default, but we find it unnecessary to do so because it is apparent that the claims in question lack merit.  Under 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

> [A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), limits a federal court's authority to grant habeas relief when a state court has adjudicated petitioner's federal claim on the merits. See 28 U.S.C. § 2254(d). Where a federal claim was "adjudicated on the merits" in state court proceedings, the writ must be denied unless adjudication of the claim either involved an unreasonable application of clearly established federal law, or was based on unreasonable determination of the facts in light of the evidence before the state court. See 28 U.S.C. § 2254(d). Specifically, § 2254(d) provides:

> (d) An application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State Court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"A state court decision is an 'adjudication on the merits,' reviewed under the deferential standard of § 2254(d), where it is 'a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground.'" Simmons v. Beard, 581 F. 3d 158, 166 (3d Cir. 2009) (quoting Rompilla v.

Horn, 355 F.3d 233, 247 (3d Cir. 2004), rev'd on other grounds sub nom. Rompilla v. Beard, 545

U.S. 374 (2005) (internal quotation marks and citation omitted)); see also Rolan v. Vaughn, 445

F. 3d 671, 678 (3d Cir. 2006).  A state court may render an adjudication on the merits of a federal

claim by rejecting the claim without any discussion whatsoever.  See Rompilla, 355 F.3d at 247.

     A court begins the analysis under § 2254(d)(1) by determining the relevant law clearly

established by the Supreme Court.  See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004).

Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's]

decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412; see also

Carey v. Musladin, 549 U.S. 70, 74 (2006) ("federal habeas relief may be granted here if the

California Court of Appeal's decision was contrary to or involved an unreasonable application of

this Court's applicable holdings").  A court must look for "the governing legal principle or

principles set forth by the Supreme Court at the time the state court renders its decision."

Lockyer v. Andrade, 538 U.S. 63, 71, 72 (2003).

     A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1), if the

state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it

"confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme]

Court and nevertheless arrives at a [different] result."  Williams v. Taylor, 529 U.S. 362, 405-06

(2000).  See also Thomas v. Carroll, 581 F. 3d 118, 124 (3d Cir. 2009) (State court's

determination was not contrary to federal law, as required for habeas relief, where Supreme

Court never faced the precise issue presented in the case).  Under the "'unreasonable application'

clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the

correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies

that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.[2]  Whether a state

court's application of federal law is "unreasonable" must be judged objectively; an application

may be incorrect, but still not unreasonable.[3]  Id. at 409-10; see also Thomas v. Varner, 428 F. 3d

491, 497 (3d Cir. 2005). "[T]his Court has held on numerous occasions that it is not 'an

unreasonable application of clearly established Federal law' for a state court to decline to apply a

specific legal rule that has not been squarely established by this Court."  See Knowles v.

Mirzayance, 129 S. Ct. 1411, 1419 (2009).  Moreover, "a court that unreasonably extends a rule

in a new context or, in the alternative, unreasonably fails to extend a rule may also be deemed to

unreasonably apply the correct rule."  Thomas, 581 F. 3d at 124-25 (quoting Fischetti v. Johnson,

384 F. 3d 140, 148 (3d Cir. 2004)).

> However, "[i]f the petitioner's legal claims were presented but not addressed by the state

courts, 28 U.S.C. § 2254(d) does not apply, and federal courts undertake a de novo review of the

claim."  Rolan, 445 F. 3d at 678.  As the New Jersey courts adjudicated petitioner's claims on the

merits, this Court may not grant relief unless either § 2254(d)(1) or § 2254(d)(2) is satisfied.  See

28 U.S.C. § 2254(d).

---

[2] See also Wright v. Van Patten, 552 U.S. 120, __, 128 S. Ct. 743, 747 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [petitioner's] favor, it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law") (citation and internal quotation marks omitted).

[3] "[D]ecisions of federal courts below the level of the United States Supreme Court may be helpful to [a court] in ascertaining the reasonableness of state courts' application of clearly established United States Supreme Court precedent, as well as helpful amplifications of that precedent."  Marshall v. Hendricks, 307 F.3d 36, 71 n.24 (3d Cir. 2002) (citations and internal quotation marks omitted).

## III.  DISCUSSION

A.  Due Process - Sufficiency of Evidence

In Ground One, Petitioner argues that the evidence was insufficient to convict him of

attempted murder of the Mancusos and conspiracy to murder them.  As factual support,

Petitioner asserts:

> [T]he most that can be said of defendant was that he was obsessed
> with his uncle, fantasized his death and discussed ways in which
> his death could occur.  This type of conduct, however, is not a
> crime.  MacPhee disclosed no conduct on defendant's part which
> could possibly be construed beyond a reasonable doubt as a
> substantial step toward the commission of a crime.  There was
> nothing presented at the end of the State's case that a reasonable
> person would possibly consider as an offense, let alone being
> corroborative of a purpose to commit murder . . . .
>
> While the defendant may have wished his uncle dead, there was no
> testimony that he ever acted on it.  Importantly, there was no
> agreement between the defendant and MacPhee . . . .  Whatever
> MacPhee may have pretended to do in order to ensnare defendant,
> it never arose to the level of an agreement between them.

(Docket Entry #1 at pp. 11-12.)

A sufficiency of the evidence claim is governed by Jackson v. Virginia, 443 U.S. 307,

318 (1979).  "[I]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 - if

the settled procedural prerequisites for such a claim have otherwise been satisfied - the applicant

is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial

no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  Id. at 324;

accord McDaniel v. Brown, 130 S. Ct. 665, 666 (2010) (per curiam).  When assessing a

sufficiency of the evidence claim in a § 2254 petition, the sufficiency of the evidence standard

"must be applied with explicit reference to the substantive elements of the criminal offense as

14

defined by state law." Jackson, 443 U.S. at 324 n.16. Jackson "requires a reviewing court to review the evidence in the light most favorable to the prosecution. Expressed more fully, this means a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" McDaniel, 130 S. Ct. at 673 (quoting Jackson, 443 U.S. at 326); see also House v. Bell, 547 U.S. 518, 538 (2006) ("When confronted with a challenge based on trial evidence, courts presume the jury resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict"). The Court emphasized that "the standard . . . does not permit a court to make its own subjective determination of guilt or innocence." Jackson at 320, n. 13. Moreover, "a reviewing court must consider all of the evidence admitted by the trial court, regardless whether that evidence was admitted erroneously." McDaniel, 130 S. Ct. at 672 (citation and internal quotation marks omitted). "[U]nder Jackson, the assessment of credibility of witnesses is generally beyond the scope of review." Schlup v. Delo, 513 U.S. 298, 330 (1995). The question is "whether, viewing the evidence in the light most favorable to the state, it was objectively unreasonable for the Appellate Division to conclude that a rational trier of fact could have found, beyond a reasonable doubt that [petitioner] was guilty[.]" Kamienski v. Hendricks, 2009 WL 1477235 (3d Cir. May 28, 2009).

In Ground One, Petitioner challenges the convictions for two counts of attempted murder of his uncle and aunt in violation of N.J. Stat. Ann. § 2C:5-1(a)(3), and conspiracy to commit murder contrary to N.J. Stat. Ann. § 2C:5-2. "A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he . . .

15

[p]urposely does or omits to do anything which, under the circumstances as a reasonable person would believe them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."  N.J. Stat. Ann. § 2C:5-1(a)(3).

As to conspiracy, New Jersey law provides:

> a.  Definition of conspiracy.  A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he:
>
> (1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>
> (2) Agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.
>
>        \*                 \*                 \*
>
> d. Overt act. No person may be convicted of conspiracy to commit a crime other than a crime of the first or second degree or distribution or possession with intent to distribute a controlled dangerous substance or controlled substance analog as defined in chapter 35 of this title, unless an overt act in pursuance of such conspiracy is proved to have been done by him or by a person with whom he conspired.

N.J. Stat. Ann. § 2C:5-2(a) and (d).

Petitioner raised Ground One on direct appeal.  The Appellate Division rejected the claim, summarizing the evidence of guilt as follows:

> Defendant argues initially that the trial judge erred in denying his motion for acquittal at the end of the State's case as to counts two and three, the charges of attempted murder and conspiracy to murder his uncle and his family. He contends that the State failed to show the substantial step necessary for attempted murder and failed to prove the agreement required for conspiracy. We disagree.

16

In viewing the evidence presented at the conclusion of the State's case, Judge Turnbach properly gave the State the benefit of all proper inferences which could reasonably be drawn from the State's proofs.  More than sufficient evidence was presented to the jury to show that defendant took substantial steps to accomplish his plan.

Defendant expected MacPhee to be released from jail in the near future. He showed MacPhee his bank statement to prove that he could pay him $5,000 to perform the killings. When MacPhee agreed, defendant provided him with details concerning the intended victims, including the home address and summer home address, phone numbers, cars and license plate numbers, physical descriptions, description of the house and Bernard Mancuso's daily routine. They discussed how the plan was to be carried out. Defendant suggested that MacPhee plant a bomb under Bernard's car while it was at the train station, plant a bomb in the house or simply shoot Bernard on his return from work. Defendant also spoke about how MacPhee was to get in touch with him after the crime and how MacPhee would get paid. A jury could reasonably conclude that by enlisting MacPhee to his evil plan and providing information to assist facilitating its purpose that defendant took substantial steps to further the crime.

Similarly, defendant's argument that there was insufficient proof for jury consideration of the conspiracy charge ignores both the testimony and the favorable permissible inferences from the evidence. MacPhee agreed to kill Bernard Mancuso and his family and continued to plan the murder with defendant, who gave him specific information to aid in the commission of the crime and promised payment of $5,000 when the crimes were committed. The fact that MacPhee knew that he would not carry out the murders is not a valid defense to the charge of conspiracy.

Urcinoli, 321 N.J. Super. at 537-538 (citations omitted).

Petitioner essentially argues that MacPhee's testimony was insufficient to establish the

elements of the crime of conspiracy to commit murder and attempted murder.  However, in his

Traverse, Petitioner admits:

17

At the time I was in the jail and had conversations with inmate/witness MacPhee, I was a very young and scared nineteen year old teenage boy afraid of being incarcerated.  As a result of this, **I did go along with agreeing with MacPhee and his murder for hire scheme.**  I never believed he was for real, but only trying to run a game on me to cheat me out of money, that I never gave him.  Before he came up with the so-called murder, he tried to get me to "loan" him bail money, because at that time he believed that I had access to three thousand dollars . . . .  Being a much more older and experienced con, he then duped me into going along with an alleged plan of murder, that I had no real reason to believe that he was serious about . . . .

I offer as proof to this court now that I was never serious about going along with MacPhee's plan is that I gave him deliberately false information.  **Initially I did give him correct information**, because I never believed he was serious or that he would ever make his bail.  However, the day before MacPhee left, he told me that he would be going home the next day.  At that point I had then became nervous and just to be sure, I had made up false information that the Mancuso family had moved to Long Island . . . .  MacPhee took notes regarding all of this and turned them over to the prosecutor.  All of this "new" information was investigated by the detectives and proven to be false.

Despite all of this, the state moved forward with attempted murder charges and I was convicted.  If I were ever at all serious about killing the Mancuso family, or part of a plot, I would not have given MacPhee false information.  I realize that the contents of these conversations with MacPhee sound very evil, this is the way a teenage boy must talk in order to stay safe from rape and assault in a correctional environment . . . .

(Docket Entry #13 at pp. 4-6) (emphasis added).

Petitioner straightforwardly admits in his Traverse that he agreed to hire McPhee to kill the Macusos and that he gave McPhee information to carry out the plan.  Petitioner has not shown that the Appellate Division's rejection of Petitioner's sufficiency of the evidence claim

was contrary to, or an unreasonable application of, <u>Jackson v. Virginia</u>.  Thus, Petitioner is not

entitled to habeas relief on Ground One.

B.  Due Process - Admission of Bad Act Evidence

In Ground Three, Petitioner argues that "THE TRIAL COURT'S ADMISSION OF

EVIDENCE THAT THE DEFENDANT STOLE A USED CAR WAS IRRELEVANT,

UNDULY PREJUDICIAL AND VIOLATED THE FOURTEENTH AMENDMENT."  (Docket

Entry #1 at p. 28.)  As factual support, Petitioner asserts:

> The court, over defendant's objection, admitted as other bad acts
> evidence testimony by Danielle Urcinoli [Petitioner's sister] that
> the defendant stole a used car in order to leave the area.  The court
> determined that the evidence was relevant on the issue of
> defendant's flight . . . .  Defendant submits that the admission of
> this other crime evidence requires reversal of the judgments of
> conviction and a remand for a new trial because the act of theft was
> irrelevant to the issue of flight and was so unduly prejudicial that it
> should have been excluded.
>
> Defendant submits that whether or not the car the defendant
> secured in order to "flee" was stolen or not was irrelevant to
> whether the act of flight occurred.  Importantly, the court should
> not admit as other crimes evidence proofs which are not relevant to
> the particular issue[s] in dispute.  The evidence of the defendant's
> purported theft of the Cadillac was offered for no other reason than
> to demonstrate that the defendant was predisposed to commit
> crime.  Even if somewhat relevant, the evidence should have been
> excluded as being unduly prejudicial.  Wherefore, the petitioner
> submits to this court that the introduction of this evidence into his
> trial had contributed to an unjust verdict in violation of the
> Fourteenth Amendment.

(Docket Entry #1 at p. 28.)

Respondents argue that Petitioner is not entitled to habeas relief on Ground Three

because the admission of evidence is a question of state law.

Petitioner presented Ground Three to the Appellate Division on direct appeal.  The

Appellate Division rejected the claim as follows:

> There is no merit in defendant's contention of error by the trial
> judge in permitting testimony by defendant's sister, Danielle, that
> defendant stole a car in order to leave the area. The evidence was
> relevant to defendant's consciousness of guilt relating to an intent
> to flee and avoid detection and apprehension.
>
>       *                *              *
>
> Defendant does not contest either the probative value of the
> testimony or that the evidence of his theft of the Cadillac was clear
> and convincing. Rather he claims that whether or not the car he
> secured in order to flee was stolen was irrelevant to the issue of
> flight and that the admission of the testimony was therefore
> prejudicial. We disagree.
>
> While flight could have been proved without evidence defendant
> stole a car, the fact that he used a stolen car to flee relates to an
> intent to avoid detection and apprehension. Defendant took the car
> in Long Island rather than return to New Jersey where he had free
> access to automobiles as a result of his employment at The Auto
> Shop. He therefore stole a vehicle that could not be traced to him
> and then installed other license plates in a further effort to avoid
> detection. We hold that the evidence was properly received and
> that the jury was appropriately instructed as to its use.

Urcinoli, 321 N.J. Super. at 540-541.

"[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned

review of the wisdom of state evidentiary rules."  Marshall v. Lonberger, 459 U.S. 422, 438 n.6

(1983).  The admissibility of evidence is generally a question of state law which is not cognizable

under habeas review.  See Keller v. Larkins, 251 F.3d 408, 416 n.2 (3d Cir. 2001) ("A federal

habeas court, however, cannot decide whether the evidence in question was properly allowed

under the state law of evidence"); Hickey v. Jeffes, 571 F.2d 762, 766 (3d Cir. 1978) ("As to the

contention that the trial court erred in admitting the victim's testimony of a prior flirtatious

conversation, we find that, if there was any error in the court's ruling . . . that error was at best

one of interpretation of the state's law of evidence and did not arise to constitutional

dimensions").  In Estelle v. McGuire, 502 U.S. 62 (1991), the Supreme Court held that the state

court's admission in petitioner's trial for murdering his infant daughter of the testimony of two

physicians that the child had suffered child abuse (evidence of rectal tearing that was six weeks

old and rib fractures that were seven weeks old) did not violate due process.

> The evidence of battered child syndrome was relevant to show
> intent, and nothing in the Due Process Clause of the Fourteenth
> Amendment requires the State to refrain from introducing relevant
> evidence simply because the defense chooses not to contest the
> point.  Concluding, as we do, that the prior injury evidence was
> relevant to an issue in the case, we need not explore further the
> apparent assumption of the Court of Appeals that it is a violation of
> the due process guaranteed by the Fourteenth Amendment for
> evidence that is not relevant to be received in a criminal trial.  We
> hold that McGuire's due process rights were not violated by the
> admission of the evidence.

Id. at p. 70.

In cases not governed by the AEDPA, the Third Circuit has held that the admission of

evidence may violate due process where the evidence "undermine[d] the fundamental fairness of

the entire trial."  Keller v. Larkins, 251 F. 3d 408, 413 (3d Cir. 2001); see also Lesko v. Owens,

881 F. 2d 44, 51 (3d Cir. 1989) ("the erroneous admission of evidence that is relevant, but

excessively inflammatory, might rise to the level of a constitutional violation"); Bisaccia v.

Attorney General of State of New Jersey, 623 F. 2d 307, 313 (3d Cir. 1980) (when "the probative

value of . . . evidence, though relevant, is greatly outweighed by the prejudice to the accused

from its admission, then use of such evidence by a state may rise to the posture of fundamental

fairness and due process of law").  But § 2254(d)(1) of the AEDPA does not permit this Court to grant habeas relief based on Third Circuit precedent.  Moreover, the admission of this evidence would not meet the Third Circuit standard in any event.

Further, this Court is not aware of any Supreme Court case clearly establishing that the admission of other crimes or bad acts evidence constitutes a violation of federal constitutional rights, and Supreme Court cases suggest the contrary.  See, e.g., Estelle v. McGuire, 502 U.S. 62 (1991) (allowing evidence of prior injuries in a trial for infant murder); Spencer v. Texas, 385 U.S. 554 (1967) (rejecting due process challenge to admission of evidence of prior similar crimes when judge gives limiting instruction).  "[The Supreme] Court has held on numerous occasions that it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, __ U.S. __, 129 S. Ct. 1411, 1419 (2009) (quotations omitted).  Because the admission of the testimony that Petitioner stole a car to flee and escape detection was not contrary to, or an unreasonable application of clearly established federal law, as determined by the Supreme Court, Petitioner is not entitled to habeas relief under Ground Three.  See Albrecht v. Horn, 485 F. 3d 103, 128 (3d Cir. 2007) ("Where evidence of a defendant's prior bad acts is admitted, a defendant's interests are protected by a limiting instruction, which mitigates the possibility of prejudice"); Charlton v. Franklin, 503 F. 3d 1112, 1115 (10th cir. 2007) (state court's admission of evidence of petitioner's prior bad acts did not render trial fundamentally unfair or warrant habeas relief); Minett v. Hendricks, 135 Fed. Appx. 547 (3d Cir. 2005) (rejecting claim that admission of "other crimes" evidence is contrary to or an unreasonable application of clearly established Supreme Court precedent).

C.  Due Process - Admission of Expert DNA Testimony

Petitioner argues in Ground Five that "THE TRIAL COURT'S ADMISSION OF

EXPERT DNA TESTIMONY VIOLATED THE FOURTEENTH AMENDMENT BECAUSE

THE REPORT WAS NOT PROVIDED TO DEFENSE COUNSEL UNTIL AFTER THE

TRIAL BEGAN."  (Docket Entry #1 at p. 30.)  As factual support, Petitioner asserts:

> Defendant objected to portions of Dr. Lisa Forman's testimony
> concerning her conclusion as to the relationship between Mr. and
> Mrs. Russo and the donor of the blood stains [from Petitioner's
> apartment] analyzed.  The results of the tests conducted by Dr.
> Forman, and from which she concluded that the donor's DNA was
> consistent with the DNA of Mr. and Mrs. Russo were not provided
> to defense counsel until after the trial began.  (6T49-1)
>
> The prosecutor explained that the ability to make this type of
> determination was the result of new technologies which did not
> exist prior to trial when discovery was provided to the defense
> (6T61-2).  The court overruled defendant's objections finding that
> he suffered no prejudice as the result of this belated discovery.
> (6T80-79 to 6T81-11).
>
> Defendant claimed that he was prejudiced because his cross-
> examination of witnesses, especially concerning testimony about
> the presence of blood in the defendant's apartment, would have
> been conducted in a different manner had Dr. Forman's opinion
> been disclosed prior to trial.  (6T54-22 to 6T55-15).  For the
> aforementioned reasons, it is submitted that the court abused its
> discretion in permitting Dr. Forman to testify, in violation of the
> Fourteenth Amendment.

(Docket Entry #1 at p. 30.)

Petitioner raised Ground Five on direct appeal to the Appellate Division.  See State v.

Urcinoli, Docket No. A-4432-03T1 slip op. at p. 4 (N.J. Super. Ct., App. Div. Mar. 1, 2005).

The Appellate Division rejected the claim without discussion.  See Urcinoli, 321 N.J. Super. at

542 ("Defendant's remaining arguments in his brief and in his *pro se* supplemental brief are without merit and do not warrant further discussion in this opinion").

"It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably.  There is no general constitutional right to discovery in a criminal case." Weatherford v. Bursey, 429 U.S. 545, 558-59 (1977).  This Court is not aware of any Supreme Court case clearly establishing that the admission of prejudicial evidence, such as the expert's testimony based on the report not provided in discovery, constitutes a violation of federal constitutional rights.  See, e.g., Estelle, 502 U.S. at 70 (rejecting due process challenge to admission of evidence of prior injuries in a trial for infant murder); Spencer v. Texas, 385 U.S. 554 (1967) (rejecting due process challenge to admission of evidence of prior similar crimes when judge gives limiting instruction); cf. Rivera v. Illinois, 129 S. Ct. 1446, 1454 (2009) ("The Due Process Clause, our decisions instruct, safeguards not the meticulous observance of state procedural prescriptions, but the fundamental elements of fairness in a criminal trial") (citation and internal quotation marks omitted).  Moreover, the admission of Dr. Forman's testimony did not render the trial fundamentally unfair, given that Petitioner has not shown how his cross-examination of any witness would have been different if he had received Dr. Forman's report prior to trial and, although defense counsel did not received the report before the trial began, the defense was nevertheless able to present its own expert testimony countering Dr. Forman.  Because the admission of Dr. Forman's testimony was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, Petitioner is not entitled to habeas relief under Ground Five.  See Wooten v. Thaler, 598 F. 3d 215 219-220

24

(5th Cir. 2010) (rejecting claim that prosecution's delay in producing the full weight of its DNA evidence violated due process since "[t]he right to fair notice . . . falls short of imposing a constitutional duty on the state to disclose incriminating evidence"); Minett v. Hendricks, 135 Fed. Appx. 547 (3d Cir. 2005) (rejecting claim that admission of "other crimes" evidence is contrary to or an unreasonable application of clearly established Supreme Court precedent); Szuchon v. Lehman, 273 F. 3d 299, 316 (3d Cir. 2001) (rejecting § 2254 petitioner's due process claim that he received inadequate notice that he faced death penalty where petitioner "made no showing that he was prejudiced by the alleged failure to have earlier notice: there is not evidence that either pre-trial counsel or trial counsel were hindered in their preparations due to the allegedly inadequate notice"); Duvall v. Reynolds, 139 F. 3d 768, 797-98 (10th Cir. 1998) (finding no due process violation where state failed to provide notice of evidence of aggravating circumstance); Watkins v. Meloy, 95 F. 3d 4, 7 (7th Cir. 1996) ("If the evidence is probative, it will be very difficult to find a ground for requiring as a matter of constitutional law that it be excluded; and if it is not probative, it will be hard to show how the defendant was hurt by its admission").

### D. Due Process - Failure to Instruct

In Ground Six, Petitioner argues that "THE INSTRUCTIONS VIOLATED THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT BECAUSE THE COURT [1] FAILED TO INCORPORATE EVIDENTIARY FACTS INTO THE CHARGE AND [2] FAILED TO CHARGE THE JURY ON THE LESSER INCLUDED OFFENSES OF AGGRAVATED AND RECKLESS MANSLAUGHTER AND PASSION-PROVOCATION MANSLAUGHTER, WHEN THE EVIDENCE REQUIRED SAME, THUS LIMITING THE

JURY'S OPTIONS TO CONVICTION OR ACQUITTAL FOR MURDER ON COUNT ONE."

(Docket Entry #1 at p. 31.)  As factual support to part one of his argument, he asserts that "the

trial judge's charge was defective, by not attempting to fit the charge to the facts adduced in the

case."  Id.  As factual support for part two of his argument, Petitioner asserts:

> Defendant contends that given the conflicting views of both the
> defendant and the state during trial, concerning whether or not a
> murder was committed, how and why the 'murder' was committed,
> and what part the defendant might have played therein; he should
> have been given the benefit of lesser included offenses.  The only
> 'evidence' linking the defendant to the 'murder' was the alleged
> "hearsay" statement which defendant supposedly made to his
> uncle, Bernard Mancuso; wherein he allegedly 'confessed to the
> crime (11T 70-19 to 71-21) (emphasis supplied).  To summarize
> same, Mr. Mancuso testified that defendant stated that he hit the
> victim in the head with a crow bar during an argument and that she
> was dead.  The defendant also stated (according to Mr. Mancuso's
> testimony) that he had slit her throat.  (emphasis supplied) . . . .
>
> In the case at bar, there can be no doubt that the case against the
> defendant, as presented by the State, cried out for a manslaughter
> instruction.  Specifically, the only motive proffered by the State to
> explain the defendant's involvement was that he was provoked by
> jealousy toward the victim's relationship with her prior boyfriend,
> Brian Mankowski . . . .
>
> In his summation, the prosecutor focused the jury's attention on the
> volatile relationship of the defendant and the victim . . . .
> "Murdered for the reason that most murders, frankly occur, as a
> result of strong feelings run amuck." (19T 11-13 to 15).  Thus, the
> State blatantly appealed to the jury's emotions in hammering home
> throughout the trial the pent up passion that the defendant by
> implication harbored, as a result of the victim's relationship with
> Mankowski.  In sum, the State painted a picture of passion
> provocation.
>
> The trial judge's error in failing to charge the jury with respect to
> the lesser included offense of passion/provocation manslaughter
> clearly denied defendant a fair trial, and violated his due process

rights as protected under the United States Constitution
(Amendments VI and XIV).

(Docket Entry #1 at pp. 32-33.)

Respondent argues that due process does not require the judge to incorporate evidentiary

facts into a jury charge and that due process did not require the judge to instruct on manslaughter

because such lesser included charges were not warranted by the evidence.

Petitioner raised Ground Six on direct appeal to the Appellate Division.  See State v.

Urcinoli, Docket No. A-4432-03T1 slip op. at p. 4 (N.J. Super. Ct., App. Div. Mar. 1, 2005).

The Appellate Division rejected the claim without discussion.  See Urcinoli, 321 N.J. Super. at

542.

A habeas petitioner who challenges state jury instructions must "point to a federal

requirement that jury instructions on the elements of an offense . . . must include particular

provisions" or demonstrate that the jury "instructions deprived him of a defense which federal

law provided to him."  Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997).  As the Third

Circuit explained,

> In considering whether this case involves a claim of error under
> the Constitution, laws, or treaties of the United States, it is critical
> to remember that the Supreme Court has made it clear that the
> states define the elements of state offenses. Accordingly, while
> there may be constitutionally required minimum criteria which
> must be met for conduct to constitute a state criminal offense, in
> general there is no constitutional reason why a state offense must
> include particular elements. *See McMillan v. Pennsylvania,* 477
> U.S. 79, 84-86, 106 S.Ct. 2411, 2415-16, 91 L.Ed.2d 67 (1986).
>
> It thus follows that for the error of state law in the justification
> instructions, assuming that there was an error, to be meaningful in
> this federal habeas corpus action, there would have to be a body of
> federal law justifying the use of deadly force which is applicable in

27

> a state criminal action charging an offense based on the defendant's
> use of that force. Then the error in the jury instructions would be
> significant if the instructions did not satisfy that body of law. Put in
> a different way, the jury instructions on justification, even if correct
> under state law, would need to have relieved the state of the
> necessity of proving an element of the offense as required by
> federal law or to have deprived the petitioner of a defense the state
> had to afford him under federal law in order to be significant in a
> federal habeas corpus action. If we concluded that a petitioner
> could obtain habeas corpus relief without making such a showing,
> then district courts in habeas corpus cases would sit as super state
> supreme courts for the purpose of determining whether jury
> instructions were correct under state law with respect to the
> elements of an offense and defenses to it.

Johnson, 117 F.3d at 110.

In the first part of Ground Six, Petitioner contends that the instructions were

unconstitutional because the judge did not specifically relate the law to the facts of the case.

However, Supreme Court precedent does not require the instructions to relate the law to the facts.

See Montana v. Egelhoff, 518 U.S. 37 (1996); Goodwin v. Johnson, 132 F.3d 162, 191 (5th Cir.

1997).  And "the fact that the instruction was allegedly incorrect under state law is not a basis for

habeas relief."  Estelle, 502 U.S. at 71-72; see also Engle v. Isaac, 456 U.S. 107, 119 (1982)

("Insofar as respondents simply challenge the correctness of the self-defense instructions under

Ohio law, they allege no deprivation of federal rights and may not obtain habeas relief").

In the second part of Ground Six, Petitioner argues that the state court violated due

process by failing to instruct on the lesser included offenses of manslaughter.  He maintains that

instructions on the lesser included offenses were required because there was evidence in the

record that he killed Nicole during an argument and that he may have been jealous.  However, as

explained below, the failure to give the lesser-included crime instructions for manslaughter was

not contrary to, or an unreasonable application of, Supreme Court precedent because (1) the Supreme Court has never held that the Due Process Clause guarantees the right of a defendant to have the jury instructed on a lesser included offense in a non-capital case, and (2) the lesser included offense instruction is constitutionally required in a capital case only when warranted by the evidence, and by rejecting the claim on direct appeal, the Appellate Division necessarily ruled that the requested lesser included offense charges were not supported by the evidence.

The Supreme Court held in Beck v. Alabama, 447 U.S. 624 (1980), that, "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense - but leaves some doubt with respect to an element that would justify conviction of a capital offense - the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted [capital] conviction" in violation of Due Process. Id., 447 U.S. at 637. The Supreme Court has not extended Beck to non-capital cases. See Gilmore v. Taylor, 508 U.S. 333, 342 (1993) ("Outside of the capital context, we have never said that the possibility of a jury misapplying state law gives rise to federal constitutional error. To the contrary, we have held that instructions that contain errors of state law may not form the basis for federal habeas relief"). In Schad v. Arizona, 501 U.S. 624 (1991), the Supreme Court held that, where a jury was given a choice between finding the defendant guilty of capital murder and the lesser included non-capital offense of second-degree murder, due process did not entitle the defendant to a jury instruction on the lesser included offense of robbery. "The goal of the Beck rule, in other words, is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence. This central concern of Beck simply is not implicated in the present case, for petitioner's jury was not

faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence." Schad, 501 U.S. at 646-47 (citations and internal quotation marks omitted).

In this case, because Petitioner did not face the death penalty, Supreme Court precedent did not require the instruction on the lesser included offenses of manslaughter. See Smith v. Spisak, __ U.S. __, 130 S. Ct. 676, 684 (2010) (no right to habeas relief if Supreme Court has not previously held jury instruction unconstitutional for same reason); Dansby v. Trombley, 369 F. 3d 657, 659 (6th Cir. 2010) ("Dansby's [§ 2254] claim fails because the Supreme Court has never held that due process requires the giving of jury instructions on lesser-included offenses in noncapital cases"); Sabillo v. Secretary, Dept. of Corrections, 355 Fed. App'x 346, 349 (11th Cir. 2009) ("Sabillo argues that due process required that he receive a lesser-included instruction, but the Supreme Court has never addressed whether the Due Process Clause would require the giving of such instructions in a noncapital case") (citation and internal quotation marks omitted); Carney v. Fabian, 487 F. 3d 1094, 1097 n.5 (8th Cir. 2007) ("Because the Supreme Court has never held that due process requires the giving of lesser-included-offense instructions in noncapital cases, the trial court's refusal to give the heat-of-passion manslaughter instruction here cannot be considered to be contrary to clearly established federal law") (citation and internal quotation marks omitted); Dockins v. Hines, 374 F. 3d 935, 938 (10th Cir. 2004) (rejecting habeas claim that trial court improperly failed to instruct on a lesser included offense because "[t]he Supreme Court has never recognized a federal constitutional right to a lesser included offense instruction in non-capital cases").

In any event, Supreme Court precedent holds that a lesser included offense instruction is required (in a capital case) only if supported by the evidence, and by rejecting Petitioner's claim

30

without discussion, the Appellate Division necessarily ruled that a manslaughter instruction was

not clearly indicated by the facts in the record.  See Hopper v. Evans, 456 U.S. 605 (1982) ("due

process requires that a lesser included offense instruction be given [in a capital case] *only* when

the evidence warrants such an instruction"); Kontakis v. Beyer, 19 F. 3d 110, 119 (3d Cir. 1994)

("Nothing in Beck permits us to grant habeas relief when a state court refuses to charge a jury

that it may convict a defendant for an offense when under state law the evidence could not justify

the conviction").

Habeas relief on Ground Six is not warranted because the failure to relate the facts to the

law and the failure to instruct on the lesser included offenses of murder were not contrary to, or

an unreasonable application of, clearly established federal law, as determined by the Supreme

Court.

**E.  Due Process - Failure to Sever**

In Ground Four, Petitioner argues that the "FAILURE TO SEVER COUNTS TWO,

THREE, AND FOUR [attempted murder of the Mancusos and conspiracy to commit murder]

VIOLATED THE FOURTEENTH AMENDMENT BECAUSE PREJUDICE TO THE

DEFENDANT OUTWEIGHED JUDICIAL ECONOMY."  (Docket Entry #1 at p. 29.)  As

factual support, Petitioner asserts:

> In this case the acts alleged in counts two, three, and four occurred
> six months after the murder charged in count one.  In this case, the
> witnesses called to testify concerning counts two, three, and four
> did not give essential testimony concerning the murder charged in
> count one.  Separate trials would not have consumed an undue
> amount of judicial and prosecutorial time . . . .
>
> Defendant submits that this is one of those cases where the
> prejudice clearly outweighed any theory of admissibility of

31

evidence on one to prove guilt on another.  This is one situation where each case should have been allowed to stand on its own merits.  It was a joinder which had the clear capacity to spread guilt from one charge to another.  That is why severance was crucial <u>sub judice</u>.

<u>Id.</u>

Petitioner presented Ground Four to the Appellate Division on direct appeal.  The

Appellate Division rejected the claim as follows:

We also find no error in the denial of defendant's motion to sever count one of the indictment, charging the murder of Nicole Russo, from the other counts of attempted murder and conspiracy with MacPhee to murder the Mancusos. Whether a severance should be granted is a matter of the discretion of the trial judge, and we defer to that decision absent an abuse of discretion. Similar or related offenses may be joined for a single trial as long as the defendant's right to a fair trial is not prejudiced.  The test is whether the jury could arrive at a decision on each charge separately and irrespective of the evidence concerning guilt on the other charges.

Central to deciding whether joinder is prejudicial is whether, assuming the charges were tried separately, evidence of the offense sought to be severed would be admissible under Evidence Rule 55 [now <u>N.J.R.E. 404</u>(b)] in the trial of the remaining charges. If the evidence would be admissible at both trials, then the trial court may consolidate the charges because a defendant will not suffer any more prejudice in a joint trial than he would in separate trials.

While there was a time span of approximately six months from Nicole's murder to the alleged crimes against the Mancusos, evidence of each of the crimes is so interrelated as to be admissible at separate trials. The proofs showed that defendant confessed killing Nicole to his uncle and that his uncle was scheduled to testify against defendant on that charge. A plan by defendant to kill his uncle or his family in order to prevent him from testifying would obviously be relevant as to motive on the charges of attempted murder and conspiracy to murder the Mancusos. See <u>N.J.R.E. 404</u>(b). Moreover, the attempt and plot to kill the witness or his family would also be admissible on the charge of murdering Nicole since it would illuminate defendant's consciousness of guilt.

32

> In the absence of undue prejudice and with recognition of judicial
> economy, we find no abuse of discretion in denying the motion to
> sever the counts of the indictment.

Urcinoli, 321 N.J. Super. at 541-543 (footnotes, citations and internal quotation marks omitted).

The Supreme Court has observed that "[i]mproper joinder does not, in itself, violate the Constitution.  Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." United States v. Lane, 474 U.S. 438, 446 n.8 (1986).  Denial of a motion to sever violates due process "only if there is a serious risk that a joint trial would compromise a specific right of . . the defendant[], or prevent a jury from making a reliable judgement about guilt or innocence." Zafiro v. United States, 506 U.S. 532, 539 (1993).  Moreover, "a fair trial does not include the right to exclude relevant and competent evidence."  Id. at 540 (citation and internal quotation marks omitted).

In this case, the joinder of the charges of conspiracy and attempted murder with the murder charge allowed the state to present the full chronology of related events, avoided the need to repeat evidence at separate trials, and did not compromise a specific right of Petitioner or prevent the jury from reliably judging Petitioner's guilt or innocence.  Thus, joinder of charges did not deny Petitioner a fair trial and the New Jersey courts' adjudication of the claim was not contrary to, or an unreasonable application of Lane or other Supreme Court holdings.  See Cummings v. Sirmons, 506 F. 3d 1211, 1239 (10th Cir. 2007) (where "it seems inconceivable that the State could have prosecuted Cummings for Melissa's murder without being permitted to provide the jury with some evidence regarding the events leading up to Melissa's death," failure to sever was not unreasonable application of Lane); Davis v. Coyle, 475 F. 3d 761, 777 (6th Cir.

2007) ("By allowing joinder of offenses, the possibility exists that a jury may use the evidence of one of the charged crimes to infer a general criminal disposition by the defendant; the jury also may confuse or cumulate the evidence of the various crimes charges.  The prejudice that Davis must demonstrate, however, in order to justify a grant of a writ of habeas corpus is *actual* prejudice, not merely the *potential* for prejudice") (citations omitted; emphasis in original); Comer v. Schriro, 463 F. 3d 934, 957-59 (9th Cir. 2006) (state death penalty trial was not rendered fundamentally unfair by joinder of homicide count with kidnapping, robbery and sexual assault charges, since some evidence was admissible as to all counts, jury instruction limited prejudice, and evidence relating to all counts was strong); Johnson v. Bett, 394 F. 3d 1030 1037 (7th Cir. 2003) (joinder of defendants did not violate due process where "[t]rying them together allowed the State to present a chronology of what happened" and avoided repetition of evidence at separate trials);  Herring v. Meachum, 11 F.3d 374, 377-78 (2nd Cir. 1993) ("where a defendant is claiming a due process violation based upon joinder of offenses, he must, to succeed, go beyond the potential for prejudice and prove that *actual* prejudice resulted from the events as they unfolded during the joint trial").

### F.  Fourth Amendment

In Ground Two, Petitioner contends that "THE WARRANTLESS ENTRY BY POLICE INTO DEFENDANT'S APARTMENT VIOLATED THE FOURTH AMENDMENT AND ALL SUBSEQUENT POLICE SEARCHES WERE THE FRUIT OF THIS CONDUCT."  (Docket Entry #1 at p. 26.)  Petitioner argues that the special needs exception was inappropriately applied. Id.  As factual support, he asserts:

> [B]efore he entered the apartment Detective Bender conceded that
> the information he had made him "suspicious" about what had
> occurred . . . .  [O]n March 13, 1995[, t]he defendant gave the
> Detective a fictitious home address.  Detective Bender learned that
> the defendant had a "minor disagreement" with Nicole Russo.
> Detective Bender knew that the defendant switched vehicles.  The
> defendant failed to respond to Detective Bender's subsequent calls.
> Detective Bender knew that Nicole did not go to Brian
> Mankowski's house on the night of March 12, 1995.  Detective
> Bender knew that the defendant . . . was not going to report for
> work.  Detective Bender knew that Nicole never arrived at the
> defendant's mother's residence.  Finally, the Detective knew that
> Nicole uncharacteristically left her back-pack at defendant's
> apartment when she purportedly left with him to go to New York.
>
> Clearly, these factors demonstrate that on the afternoon of March
> 15, 1995 when Detective Bender secured his warrantless
> admittance inside the defendant's apartment it was in furtherance
> of a criminal investigation that he was conducting.  The officer's
> conduct was contrary to the Fourth Amendment.  The physical
> entry of the home is the chief evil against which the wording of the
> Fourth Amendment is directed.

(Docket Entry #1 at pp. 26-27 (citations omitted)).

Petitioner presented Ground Two to the Appellate Division on direct appeal.  The

Appellate Division considered and rejected the merits of the claim as follows:

> Defendant next argues that Detective Bender's entry into his
> Parkside Motel apartment on March 15, 1995, was illegal because
> no search warrant was obtained and that, therefore, the results of
> the search and all subsequent seizures were tainted as the fruit of
> unlawful police conduct . . . .
>
> The inevitable discovery rule was initially set forth by the United
> States Supreme Court in *Nix v. Williams,* 467 *U.S.* 431 . . . (1984),
> and was adopted by our Court in *State v. Sugar* ( *Sugar II* ), 100
> *N.J.* 214, 238-39 . . . (1985). The rule provides that "[e]vidence is
> admissible even though it was the product of an illegal search,
> 'when ... the evidence in question would inevitably have been
> discovered without reference to the police error or misconduct,
> [for] there is no nexus sufficient to provide a taint.' " *State v.*

35

*Sugar* ( *Sugar III* ), 108 *N.J.* 151, 156 . . . (1987) (quoting *Nix, supra, 467 U.S.* at 448 . . . .

In order to invoke the inevitable discovery rule, the State has to prove by clear and convincing evidence that:

(1) [p]roper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all of the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means.

[ *State v. Sugar* ( *Sugar II* ), *supra,* 100 *N.J.* at 238, 495 *A.*2d 90.]

There can be no doubt that proper, normal and specific investigatory procedures would have been pursued in order to locate Nicole, who was at first considered a missing person. The pursuit of these procedures led to Bender's conversation with Romaniello, which raised significant questions concerning defendant, since defendant had told Bender that he had been in Brooklyn at 9:30 p.m. on Sunday night but Romaniello placed him at the apartment. Moreover, earlier in the evening Romaniello had seen defendant change his clothes and stand outside in cold weather dressed only in jeans, and make a pay phone call even though there was a telephone in his room. Romaniello also heard a thump against the wall and saw defendant leave in a white van with a rolled up carpet. Finally, the day after the warrantless search, Bender learned that defendant had confessed to his uncle to murdering Nicole in his motel room in New Jersey. All of these events would have formed the supportable basis for a warrant.

Alternatively, Hansen, the motel owner, would have eventually entered the room abandoned by defendant, who had told his uncle that he was fleeing with no intention of returning to New Jersey. Considering the police activity, the attendant publicity and the concerns of Nicole's father, it is certain that Hansen would have turned over all of Nicole's items and permitted entry and search by the police.

36

> We hold that the State established by clear and convincing evidence as found by the trial judge, *see State v. Johnson,* 120 *N.J.* 263, 289 . . . (1990), that all of the evidence uncovered in the initial, warrantless search would eventually and inevitably have been found independent of the search and that the motion to suppress evidence seized as a result of the initial entry as well as all subsequent searches was properly denied.

Urcinoli, 321 N.J. Super. at 538-39.

Petitioner's Fourth Amendment claim is precluded by the holding of Stone v. Powell, 428

U.S. 465 (1976), wherein the Supreme Court held that

> where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.  In this context the  contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal, and the substantial societal costs of application of the rule persist with special force.

Stone v. Powell, 428 U.S. at 494-95 (footnotes omitted); see also Marshall v. Hendricks, 307 F.

3d 36, 82 (3d Cir. 2002) ("An erroneous or summary resolution by a state court of a Fourth

Amendment claim does not overcome the [Stone] bar") (citations omitted).

In this case, Petitioner had a full and fair opportunity to present his Fourth Amendment

claim to the New Jersey courts.  Petitioner "is at most alleging that the Fourth Amendment

claims were decided incorrectly or incompletely by the New Jersey courts, allegations which are

insufficient to surmount the Stone bar."  Marshall, 307 F. 3d at 82.  Because Petitioner had a full

and fair litigation of his Fourth Amendment claims and "[a]n erroneous . . . resolution by a state

court of a Fourth Amendment claim does not overcome the [Stone] bar," id., Petitioner's Fourth

Amendment claims are not cognizable in this § 2254 proceeding.  See Hubbard v. Jeffes, 653 F.2d 99, 103 (3d Cir. 1981).

G.  Ineffective Assistance of Counsel

In Grounds Seven and Eight, Petitioner contends that counsel was constitutionally ineffective in failing to request manslaughter instructions, advising Petitioner not to testify, pursuing a losing trial strategy that the State had not established the death of Nicole Russo, failing to argue that Nicole committed suicide, failing to argue that Petitioner killed Nicole in the heat of passion or self defense, and improperly cross examining witnesses.  (Docket Entry #1, pp. 34, 38.)

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right . . . to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance.  See Strickland v. Washington, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied.  See Strickland, 466 U.S. at 687.  First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness."  Id. at 687-88.  To meet this prong, a "convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  Id. at 690.  The court must then determine whether, in light of all the circumstances at the time, the identified errors were so serious that they were outside the wide range of professionally competent assistance.  Id.

38

To satisfy the prejudice prong, the defendant must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.  As the Supreme Court explained,

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

Strickland, 466 U.S. at 695-96.

The Supreme Court instructs that a court need not address both components of an ineffective assistance claim "if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.

In this case, Petitioner contends that counsel was constitutionally ineffective in failing to request manslaughter instructions, advising Petitioner not to testify, pursuing a losing trial strategy (that the State had not established the death of Nicole Russo), and improperly cross examining witnesses.  (Docket Entry #1, pp. 34, 38.)  According to Petitioner, the jury would have not have found him guilty of murder if counsel had argued that Nicole committed suicide while Petitioner was at the 7-Eleven, or that Petitioner killed her in the heat of passion or in self

defense.  This Court will first address the manslaughter instruction and then the reasonableness of counsel's strategy.

Petitioner argues that counsel was constitutionally ineffective in failing to request instructions on the lesser included offenses of manslaughter.  As factual support, he asserts:

> Mr. Urcinoli vigorously asserts his innocence.  However, given the facts as presented by the prosecution, the defendant submits that trial counsel should have requested that the court charge the jury with passion/provocation manslaughter.  This is a case wherein the Government alleged that Nicole Russo was the victim of the rage of Mr. Urcinoli because she was going to leave him for Brian Mankowski.  This case was a classic love triangle murder situation.  The evidence presented by the Government revealed that Mr. Urcinoli at the most was only guilty of passion/provocation manslaughter . . . .  The present case is one in which there was no eyewitness testimony, and the record was essentially barren [] regarding the defendant's intent.  The mutual combat in this case may have been provoked by Nicole Russo, and that combat apparently began on even terms.  Therefore, defendant respectfully submits that trial counsel was ineffective because he failed to request a jury charge that included the lesser included offenses of murder.

(Docket Entry #1 at p. 38.)

This Court, and the New Jersey courts, have ruled that a manslaughter instruction was not warranted.  Petitioner's attorney could not have been deficient in failing to ask for a manslaughter instruction that was not warranted under state or federal law.

Petitioner next argues essentially that counsel was incompetent in arguing that the state failed to prove the death of the victim, since no body was found.  Petitioner contends that counsel should have argued that (a) Nicole committed suicide, (b) Petitioner killed Nicole in the heat of passion, and/or (c) Petitioner killed Nicole in self defense.  Petitioner states that he wanted to testify that Nicole committed suicide (on the weekend she broke up with him and returned to her

old boyfriend) while he went to a convenience store for a snack and he panicked, disposed of her

body, lied to the police and Nicole's father, confessed to his uncle that he had killed her, fled to

California, and enlisted MacPhee to kill his uncle, but his attorney incompetently advised him

not to testify.  Alternatively, Petitioner maintains that, if counsel had only argued that he killed

Nicole in the heat of passion or in self defense, then the jury would not have found him guilty of

murdering Nicole, despite his confession of murder to his uncle, his disposal of her body, his

lying to Detective Bender and Nicole's father, his flight to California, and his conspiracy with

MacPhee.

Specifically, Petitioner argues in Ground Seven that counsel was ineffective in advising

Petitioner not to testify and instead arguing that the state failed to prove death, a losing strategy

that the jury rejected.  As factual support, Petitioner asserts:

> The defendant submits that if he would have been permitted to
> testify that he could have explained to the jury that Nicole Russo
> committed suicide, and that he did not kill her.  The defendant did
> not testify because his trial counsel refused to permit him to testify,
> and because he did not believe his version of the facts of the case.
> It should also be noted here that the way Judge Turnbach had
> explained to me at the end of the trial as to whether or not I wanted
> to testify, is not the way counsel had explained it to me.
>
> *                    *                    *
>
> . . . .  Mr. Urcinoli submits that he is an innocent man.  Mr.
> Urcinoli submits that if the jury would have been able to hear him
> testify, and if they would have been able to review Nicole Russo's
> voluminous psychiatric records then they would have acquitted
> him.
>
> The jury may have convicted Mr. Urcinoli because they thought he
> had something to hide.  Furthermore, Mr. Urcinoli's case was
> rather complicated.  The jury should have at least the opportunity
> to review the testimony.  Mr. Urcinoli's testimony would have

41

shed light on many of the issues presented at trial.  This crucial error can hardly be dismissed as tactical error.

The major point is that [counsel] was ineffective because he pursued an erroneous trial strategy.  [Counsel] should have used the trial strategy and defense that Mr. Urcinoli wanted to use.  Mr. Urcinoli wanted to testify.  If Mr. Urcinoli would have been permitted to testify then he could have explained to the jury that he found Nicole dead in his apartment, after she committed suicide.  Mr. Urcinoli would have testified that March 12, 1995, he was with Nicole Russo in his Seaside Heights apartment.  Mr. Urcinoli would have further testified that he went to the Seven Eleven to buy some items.  Mr. Urcinoli would have testified that when he returned from the Seven Eleven he found Nicole lying dead on his apartment floor with a knife sticking out of her neck and her left wrist was cut . . . .  After returning to my apartment from making the first trip to purchase chips, orange juice, etc., is when I discovered Nicole was dead.  A second trip to the store was made later on to purchase garbage bags.  (See "Interview of Jennifer Clark")

Mr. Urcinoli would have testified that he panicked and did not report the suicide to the Police.  Mr. Urcinoli did not report the suicide to the Police because he believed that he would be blamed for Nicole's death.  Nicole used Mr. Urcinoli's knife to commit suicide.

The main point is that [counsel] pursued an erroneous defense.  The plain truth of the matter is that Nicole Russo committed suicide, and that Mr. Urcinoli did not kill her.  Nicole Russo had a very lengthy record of psychiatric problems.  In November 21, 1992, Nicole Russo was admitted to the Monmouth Medical Center for depression.  The discharge summary diagnosed her with a development disorder.

*    *    *

Another interesting point is that in a pre-trial interview of Stacy Crowl she revealed that Nicole Russo had an obsession with suicide.  An interview with Stacy Crowl was conducted by defense counsel on April 19, 1996.  Ms. Crowl was Nicole Russo's best friend, and they attended high school together.  Ms. Crowl was called as a witness for the defendant.  However, unfortunately

> [counsel] failed to ask Ms. Crowl about all her discussions with
> Nicole Russo about her suicide ideations.  The defendant
> specifically requested that [counsel] ask Ms. Crowl about all of
> Nicole's discussions about suicide.  However, [counsel] refused to.
> This was a very important issue because if Ms. Crowl would have
> issued the same testimony as she did in her statement, then it is
> probable that the jury could have acquitted the defendant on the
> theory that Nicole Russo committed suicide . . .

(Docket Entry #1 at pp. 34-37.)

Petitioner further contends that counsel "was constitutionally ineffective for failing to

properly cross-examine several witnesses," since proper cross examination would have

established that Nicole committed suicide or that he killed her in self defense or in the heat of

passion.  (Docket Entry #1, p. 41.)  As factual support, Petitioner refers to his pro se

supplemental brief filed in his first petition for post-conviction relief and asserts:

> Petitioner respectfully asks the court to review his seventeen page
> pro se supplemental brief filed on his first petition for post
> conviction, along with his ninety-four page appendix.
>
> The core of the arguments are additional aspects of ineffective
> assistance of counsel claims pertaining to the cross examination of
> certain witnesses.
>
> Petitioner submits in his claim that [counsel] did not properly
> cross-examine witnesses Detective Frulio, Thomas MacPhee,
> Detective Thompson, Fred Wild, Tony Getchius, Stacy Crowl, and
> Susan Stanger.
>
> Petitioner further submits that [counsel] failed to properly
> demonstrate the relation of such witnesses Tony Getchius, Stacy
> Crowl, and Susan Stanger, as explained in his brief.
>
> *                    *                    *
>
> [My attorney] did not make any attempt to even cross examine
> [Tony Getchius] at all.  The purpose for the prosecutor calling this
> witness was to make it seem like this phone call was some type of

43

> confession for murder.  If trial counsel would have made a little
> effort, he could have easily have proved the truth of this particular
> manner, as I am trying to now to this court.  Trial counsel did not
> use the copy of Getchius' statement to impeach his testimony, to
> just simply find out that Getchius was mistaken about the day of
> this call [which occurred prior to the date of Nicole Russo's
> disappearance].

(Docket Entry #1 at pp. 41-43.)

Per Petitioner's insistence, this Court has reviewed his pro se supplemental brief filed in

the Appellate Division on appeal from the denial of post-conviction relief.  Petitioner argued

there that

> proper preparation by counsel could have established a favorable
> trial strategy, namely, that the killing did not constitute murder.
> Counsel was remiss in failing to establish a credible basis for this
> trial strategy.
>
> Additionally, the facts could have established a basis for a viable
> defense of self defense to the murder charge.  It could have been
> argued that, in light of defendant's mental condition he "reasonably
> believe(d) that such force [was] immediately necessary."  See
> N.J.S.A. 2C:3-4.
>
>                    *                    *                    *
>
> According to defendant, Nicole Russo committed suicide and [] the
> defendant did not kill her.  Nicole Russo had a very length[y]
> record of psychiatric problems.  On November 21, 1992, Nicole
> Russo was admitted to Monmouth Medical Center for depression.
> The discharge summary diagnosed her with a development
> disorder.
>
>                    *                    *                    *
>
> Ms. Crowl was called as a witness for the defendant.  However,
> trial counsel failed to properly examine Ms. Crowl about all her
> discussions with Nicole Russo and about Nicole's suicide
> ideations.  The defendant specifically requested that trial counsel
> ask Ms. Crowl about all of Nicole's discussions about suicide.

44

However, counsel refused to do so.  Had counsel done so, it is probable that defendant would have been acquitted since the jury would have viewed Nicole's death as a suicide . . . .

Defendant contends that trial counsel failed to properly cross examine the witnesses Fred Willis, Tony Getchius and Detective Frulio.

First, defendant contends that trial counsel failed to object to the following direct testimony of Detective Vincent Frulio.  "There was information that Nicole Russo's body may have been dumped into a dumpster behind a shopping center in Oakdale, Long Island."  In the context of the questioning, it appears that the information regarding the dumpster was obtained from Bernard Mancuso.  However, defendant contends, the information was gained from defendant's own out of court statement which statement had previously been suppressed by the court.

*        *        *

Defendant also contends that trial counsel was ineffective in failing to adequately cross examine Fred Wild to demonstrate that defendant did not cash checks he had had in his possession while police were searching for his whereabouts.  Defendant contends this information would have led the jury to a different result.

Lastly, defendant contends that trial counsel was ineffective in failing to conduct a proper cross examination and investigation of state's witness Tony Getchius.  This witness testified that he received a phone call from the defendant on the night of March 12, 1995.  Defendant denies the phone call ever took place and believes proper cross examination and investigation of this witness would have uncovered a nefarious motive for his false testimony.

(Appendix at RA 10, pp. 36, 40, 42-44) (citations omitted).

Petitioner presented the aforesaid ineffective assistance of counsel claims in his first petition for post-conviction relief.  The Appellate Division rejected the claims as follows:

At trial, defendant "based his defense on the theory that Nicole was a troubled runaway who had absconded and remained away." Urcinoli, supra, 321 N.J. Super. at 535.  He argues here that, "[the

45

facts support a claim that [his] conduct did not constitute murder but, rather, only rose to the level of passion/provocation manslaughter." He further contends that, "[i]n light [of] the apparently provocative nature of the confrontation which may have preceded the killing in this case, proper preparation by counsel could have established a favorable trial strategy, namely, that the killing did not constitute murder. Counsel was remiss in failing to establish a credible basis for this trial strategy."

While arguing that his trial counsel should have prepared a strategy based on passion/provocation, defendant also "vigorously asserts his innocence." Nevertheless, he states, "[t]his case was a classic love triangle murder situation."

Defendant next argues that he "always wanted to exercise his right to testify to prove his innocence." He claims that his "trial counsel essentially forced [him] to forego his right to testify in this case." When the trial judge specifically asked defendant if he wanted to testify during the trial, however, defendant indicated that he chose not to testify. He never asserted at that time that he wanted to testify but his attorney advised against it.

Defendant next contends that his trial counsel was ineffective in not allowing defendant to testify because "[i]f [he] would have been permitted to testify then he could have explained to the jury that he found Nicole dead in his apartment, after she committed suicide." With respect to this point, defendant claims that he "would have testified that he panicked and that he did not report this suicide to the police." In support of his contention that Nicole committed suicide, he points to the evidence that Nicole had psychiatric problems, and had been hospitalized and treated for depression. Moreover, he claims that in a pre-trial interview, Stacy Crowl, Nicole's best friend, revealed to defendant's counsel that Nicole had an obsession with suicide. Ms. Crowl testified at trial. Defendant argues, however, that "trial counsel failed to properly examine Ms. Crowl about all her discussions with Nicole Russo and about Nicole's suicide ideations."

Obviously, defendant's claims are contradictory and we would have to suspend common sense and credibility to accept his argument here. While a defendant can assert a defense based on factual innocence and simultaneously seek instructions on a different legal theory based on the evidence (such as

46

passion/provocation if the jury concluded he was involved) . . . ,
this defendant's arguments are so inconsistent that they cannot be
discussed in a logical, lineal fashion.  He wants us to believe (1) he
is totally innocent; (2) the murder was provoked by a classic love
triangle; (3) Nicole committed suicide; (4) he panicked; and (5)
had he testified, he would have persuaded the jury of his
innocence.

Defendant's claims are so obviously without merit that we need not
discuss them at length.  An evidentiary hearing on a petition for
post-conviction relief is necessary only when a defendant
demonstrates a <u>prima</u> <u>facie</u> case; that is, a reasonable likelihood of
succeeding under the two prong test for ineffective assistance of
counsel articulated in <u>Strickland</u> . . . .

Under the <u>Strickland</u> test, defendant must show (1) a reasonable
likelihood of being able to rebut the strong presumption of
competent performance on counsel's part and (2) that, but for
counsel's ineffective assistance, the result of the trial would have
been different.  When a defendant claims that counsel failed to
litigate a particular issue, the defendant must prove that the
underlying issue is meritorious and that there is a reasonable
likelihood that the verdict would have been different had the issue
been raised.

Here, defendant has failed to demonstrate a <u>prima</u> <u>facie</u> case.

<u>State v. Urcinoli</u>, Docket No. A-6329-99T4 slip op. at pp. 3-5 (N.J. Super. Ct., App. Div., Dec.

10, 2001) (citations and internal quotation marks omitted).

"The <u>Strickland</u> . . . standard is applicable when a petitioner claims his attorney was

ineffective by denying him his constitutional right to testify."  <u>Palmer v. Hendricks</u>, 592 F. 3d

386, 394 (citation and internal quotation marks omitted).  However, as the Supreme Court

explained in <u>Knowles v. Mirzayance</u>, 129 S. Ct. 1411  (2009), counsel cannot be constitutionally

deficient in failing to pursue a defense that had almost no chance of success:

[T]he state court's rejection of Mirzayance's ineffective-assistance-
of-counsel claim [based on failure to present an insanity defense]

47

was consistent with <u>Strickland</u>.  The Court of Appeals insisted, however that reasonably effective assistance required here that counsel assert the only defense available.  But we are unaware of no "prevailing professional norms" that prevent counsel from recommending that a plea be withdrawn when it is almost certain to lose.  <u>See</u> <u>Strickland</u>, <u>supra</u>, at 688 . . . .  And in this case, counsel did not give up the only defense available.  Counsel put on a defense to first-degree murder . . . .  The law does not require counsel to raise every available nonfrivolous defense.  <u>See</u> <u>Jones v. Barnes</u>, 463 U.S. 745, 751 . . . (1983) . . . .  Counsel also is not required to have a tactical reason-above and beyond a reasonable appraisal of a claim's dismal prospects for success- for recommending that a weak claim be dropped altogether. Mirzayance has thus failed to demonstrate that his counsel's performance was deficient.

<u>Knowles v. Mirzayance</u>, 129 S. Ct. at 1421-22 (citations, internal quotation marks and footnote omitted).

In this case, given the overwhelming evidence of guilt presented at Petitioner's trial, Petitioner has not shown a reasonable probability that the result of the trial would have been different if counsel had advised Petitioner to testify that Nicole committed suicide, or if counsel had argued that Petitioner killed Nicole in the heat of passion or in self defense.  Petitioner confessed to his uncle that he killed Nicole by striking her with a crowbar several times and then stabbing her; Petitioner lied to Detective Bender about his address and driving Nicole to Brooklyn; Petitioner disappeared when Detective Bender verified that Petitioner had lied; Petitioner arranged for MacPhee to kill Petitioner's uncle so he wouldn't be able to testify against Petitioner; and the police found blood in Petitioner's apartment and evidence that a significant amount of blood had been cleaned up throughout Petitioner's apartment.  Moreover, while there was substantial evidence that Petitioner was angry and upset as a result of Nicole's decision to return to her prior boyfriend, there was no evidence (aside from Petitioner's would-be self-

serving testimony) that Nicole was at that time suicidal or that there was any reasonable basis for believing that she had committed suicide that weekend.  Because Petitioner has not shown that the result of the trial would have been different if counsel had argued that Nicole committed suicide or that Petitioner killed her in the heat of passion or in self defense, the New Jersey courts' rejection of the claim was not contrary to or an unreasonable application of Strickland or other Supreme Court precedent.[4]  See Berghuis v. Thomkins, __ U.S. __,130 S. Ct. 2250, 2265 (2010) (ineffective assistance of counsel claim fails because "on this record [petitioner] cannot show prejudice"); Palmer, 592 F. 3d at 395 ("Palmer's stated desire to tell his side of the story and his conclusory invocation of the words 'self-defense' are not sufficient to show that the decision reached would reasonably likely have been different absent the errors") (citations and internal quotation marks omitted); Webb v. Rozum, 336 Fed. App'x 182, 184 (3d Cir. 2009) ("[T]he Superior Court's adjudication of Webb's claim did not result in a decision that was contrary to, or an unreasonable application of, Strickland.  Given the restaurant patron's

---

[4] Nor has Petitioner shown that counsel was constitutionally deficient in arguing that the state failed to establish Nicole's death beyond a reasonable doubt.  See also Strickland, 466 U.S. at 689 ("Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy"); Price v. Wynder, 350 Fed. App'x 692, 695 (3d Cir. 2009) ("With respect to the PCRA court's application of federal law, Strickland mandates deference to tactical decisions made by trial attorneys and AEDPA mandates deference to state court decisions interpreting Strickland.  It was reasonable for the PCRA court to conclude that Strickland affords counsel discretion to make adverse credibility determinations about potential witnesses notwithstanding the fact that their testimony might be helpful in certain respects.  Price cites no 'clearly established' Supreme Court precedent (or any precedent for that matter) to suggest otherwise"); Thomas v. Varner, 428 F. 3d 491, 499 (3d Cir. 2005) ("To overcome the Strickland presumption that, under the circumstances, a challenged action might be considered sound trial strategy, a habeas petitioner must show either that:  (1) the suggested strategy (even if sound) was not in fact motivating counsel or, (2) that the actions could never be considered part of a sound strategy").

identification of Webb, the other evidence presented against him, and our doubly deferential review in this case, we cannot say that Webb has demonstrated prejudice") (citation and internal quotation marks omitted); <u>Cummings v. Sirmons</u>, 506 F. 3d 1211, 1230 (10th Cir. 2007) (rejecting claim that trial counsel erroneously advised petitioner not to testify because advice was not deficient where "counsel had ample reasons to advise him not to testify at trial" and, in light of strong evidence of guilt, jury could not have reasonably found petitioner's assertions of innocence believable).  In this case, the totality of the evidence shows that no reasonable probability exists that the result of Petitioner's trial would have been different had his counsel advised him to testify and argued that Nicole committed suicide, or argued that Petitioner killed Nicole in the heat of passion or in self defense.  Thus, Petitioner is not entitled to habeas relief based on counsel's failure to pursue these strategies.

## H.  Certificate of Appealability

The AEDPA provides that an appeal may not be taken to the court of appeals from a final order in a § 2254 proceeding unless a judge issues a certificate of appealability on the ground that "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Court denies a certificate of appealability pursuant to 28 U.S.C. § 2253(c) because Petitioner has not made a substantial showing of the denial of a constitutional right.

### III.  CONCLUSION

Based on the foregoing, the Court dismisses the Petition for a Writ of Habeas Corpus and denies a certificate of appealability.


_____/s/ Garrett E. Brown, Jr._____
**GARRETT E. BROWN, JR., U.S.D.J.**
Chief Judge

DATED:  December 17, 2010